1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

11

EASTERN DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19

CLARENCE NEAL,                    Case No.  1:14-cv-01053-SKO

       Plaintiff,          **ORDER REGARDING PLAINTIFF'S COMPLAINT**

    v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____/

20

## I.   INTRODUCTION

21

     Plaintiff Clarence Neal ("Plaintiff") seeks judicial review of a final decision of the

22

Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for

23

supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act.  42 U.S.C.

24

§§ 1381-83.  The matter is currently before the Court on the parties' briefs, which were submitted,

25

without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

26
27
28

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge, and the matter was assigned for all purposes to Magistrate Judge Sheila K. Oberto.  (Docs 8, 9.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on September 13, 1966 (Administrative Record ("AR") 116), he completed the 11th grade, and has past relevant work as a bricklayer helper and construction worker (AR 27).  Plaintiff filed an application for SSI on October 14, 2010, alleging disability beginning on September 1, 2009,[2] due to congestive heart failure.  (AR 181.)

**A.     Relevant Evidence**

On May 5, 2010, Plaintiff was examined at the University of Utah Hospitals and Clinics when he presented with progressive dyspnea, fatigue, and lower-extremity edema which had been bothering him for two to three months prior to the examination.  (AR 244.)  He reported that his energy levels were normal up to eight months before the examination.  (AR 245.)  In September or October 2009, he was incarcerated and placed on asthma medication, but the medication did not improve his symptoms.   (AR 245.)  He began to feel more fatigue in general and did not have as much energy to perform physical activity such as lifting weights or working.  He also described mild occasional chest pain that was non-exertional.   (AR 245.)   One month prior to the examination, Plaintiff described the development of significant orthopnea as well as paroxysmal nocturnal dyspnea[3] occurring almost every night.  (AR 245.)  Plaintiff reported only being able to sleep about an hour at a time due to severe symptoms.  He also reported that four or five days prior to the examination, his breathing had significantly worsened and his legs had begun to swell.  (AR 245.)

An echocardiogram showed left ventricular ejection fraction[4] of 10% and left atrial enlargement, mild left ventricular enlargement, moderate left ventricular hypertrophy as well as

---

[2] Plaintiff amended his initial onset date to October 25, 2011, at the hearing.  (AR 38-39.)

[3] Dyspnea refers to the sensation of difficult or uncomfortable breathing.  Orthopnea is the sensation of breathlessness in the recumbent position, relieved by sitting or standing.  Paroxysmal nocturnal dyspnea is a sensation of shortness of breath that awakens a person, often after one or two hours of sleep, and is usually relieved in the upright position. *Dorland's Illustrated Medical Dictionary* 589, 1359 (31st ed. 2007).

[4] According to the American Heart Association, an ejection fraction ("EF") is a measurement of how much blood the left ventricle pumps out with each contraction of the heart.  An EF of 60 percent means that 60 percent of the total amount of blood in the left ventricle is pushed out with each heartbeat.  A measurement under 40 may be evidence of heart failure.
*See* http://www.heart.org/HEARTORG/Conditions/HeartFailure/SymptomsDiagnosisofHeartFailure/Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp# (last visited September 1, 2015).

marked right ventricular enlargement.  (AR 247.)  These findings were determined to be consistent with dilated cardiomyopathy; however, the physician determined that ischemic etiology could not be ruled out.  (AR 247.)  Plaintiff was diagnosed with heart failure.  (AR 247.)  The treatment plan was described as follows:

> There is some possibility that there is an ischemic cause to his heart failure, and for this reason, the patient will undergo left heart catheterization.  We will also obtain a lipid panel and standard labs including CBC and Chem-14.  We will obtain a chest x-ray.  Medical management will consist of aggressive diuresis with Lasix as well as beginning an ICE inhibitor.  Depending on the etiology of his heart failure, he may benefit later from a statin and will also likely have cool lower extremities, which is concerning for hypoperfusion.[5]  However, he is making good urine and has good mental status.  If the patient needs inotropes, there is a possibility he will need to be transferred to the ICU for a central line and pressor support.

(AR 247-48.)

In September 2010, Plaintiff was seen for a follow-up at the University of Utah.  (AR 252.) He reported improvement and that he walked roughly one-half mile every other day on a track at the Draper prison.  (AR 252.)  He reported shortness of breath when he climbed stairs, but he could climb up to two flights before shortness of breath began.  (AR 252.)  He also described "nondescript" chest pain which he experienced occasionally in the evenings, lasting for several minutes.  He reported a dry cough that began with the prescription medication for his heart.  (AR 253.)  He was assessed with "[s]evere nonischemic[6] dilated cardiomyopathy with an EF of 10% in May of 2010 with biventricular failure with current Class II to IIIA symptoms [c]urrently euvolemic."  (AR 253.)  He was also noted to have severe lower-ventricular systolic dysfunction secondary to nonischemic dilated cardiomyopathy.  (AR 253.)  As Plaintiff was being released from prison and moving back to California, he was referred to the University of California, San Francisco, and Stanford for continued follow-up care.  (AR 253.)

In December 2010, Plaintiff was seen at Memorial Hospitals Association in Modesto, California, and reported chest pain radiating into his left shoulder.  (AR 285-86.)  Plaintiff was

---

[5] Hypoperfusion refers to decreased perfusion of blood through an organ.  *Dorland's Illustrated Medical Dictionary* 916 (31st ed. 2007).

[6] Ischemia in relates to a deficiency of blood in a particular area, usually due to constriction of a blood vessel. *Dorland's Illustrated Medical Dictionary* 975 (31st ed. 2007).

1  administered medication and placed on a cardiac monitor. (AR 288.) At discharge, it was

2  recommended that Plaintiff follow-up with his primary care physician within 3 to 5 days. (AR

3  311.)

4  On March 12, 2011, Plaintiff underwent a consultative internal medicine evaluation with

5  Roger Wagner, M.D. (AR 340-44.) Dr. Wagner reviewed Plaintiff's clinical notes, including

6  Plaintiff's May 2010 diagnosis of nonischemic dilated cardiomyopathy. (AR 340.) Dr. Wagner

7  noted that in September 2010, Plaintiff had a cardiac catheterization which showed normal

8  coronary arteries, but he also had an EF of 10% with biventricular dilation. Dr. Wagner diagnosed

9  Plaintiff with congestive heart failure and noted Plaintiff was previously diagnosed with idiopathic

10  congestive heart failure and dilated cardiomyopathy in May 2010. (AR 343.) Upon examination,

11  Dr. Wagner gave the following impression:

12
13
14
15
16

> He does still have early dyspnea on exertion, walking only two blocks, or climbing one flight of stairs slowly. Otherwise, he is well managed despite an ejection fraction measured at 10% back in May. He has no edema on today's exam. Other than the early dyspnea on exertion, there are few signs of heart failure at the current time. He has been on Coreg, apparently for approximately 7-10 months now. I do not know if there has been a repeat echocardiogram which might be helpful to tell if the claimant is responding with any recovery of ejection fraction at the current time.

17  (AR 343-44.) Dr. Wagner opined Plaintiff could stand and walk up to four hours; no limitations

18  on sitting; and could lift and carry 20 pounds occasionally, 10 pounds frequently. (AR 344.) Dr.

19  Wagner also noted Plaintiff should not perform any climbing or balancing because of his reported

20  dizziness. (AR 344.)

21  On March 24, 2011, state agency nonexamining physician A. Nasrabadi, M.D., reviewed

22  Plaintiff's records and completed a physical residual functional capacity assessment. (AR 347-51.)

23  Dr. Nasrabadi opined Plaintiff retained the ability to occasionally lift and carry up to 20 pounds,

24  and frequently lift and carry up to 10 pounds; stand and walk for at least two hours in an eight-

25  hour day; sit about six hours of an eight-hour day; never climb ladders, ropes, or scaffolds,

26  occasionally balance and climb ramps and stairs; but could frequently stoop, kneel, crouch, and

27  crawl. (AR 349.)

28

4

1    In May 2011, apparently referred by his primary care physician, Dr. English, Plaintiff was

2  seen for his cardiac condition at Valley Heart Associates Medical Group, Inc. by Richard Ericson,

3  M.D. (AR 395.)  Plaintiff reported to Dr. Ericson that he experienced dyspnea on exertion after

4  only 1/2 block of walking, he had multiple aches and pains including left-sided sharp chest pain,

5  and right neck pain.  (AR 395.)  Dr. Ericson characterized Plaintiff's heart failure as New York

6  Heart Association class IV.[7]  (AR 398.)  Dr. Ericson stopped Plaintiff's prescription for Cozaar

7  and started him on Diovan.  (AR 398.)  If Plaintiff continued to have severely depressed left

8  ventricular systolic function with the medication, Dr. Ericson suspected he may be a candidate for

9  defibrillator placement.  (AR 398.)  Plaintiff was to follow-up with Dr. Ericson within two weeks.

10  (AR 398.)

11    On June 22, 2011, Plaintiff again saw Dr. Ericson who administered an echocardiogram.

12  (AR 392-94.)  The results showed an EF of 40-45%, which was improved over Plaintiff's May

13  2010 EF of 10%.  (AR 389.)  On examination on July 7, 2011, Plaintiff had a regular heart rate

14  and rhythm with no murmurs, rubs, or gallops.  (AR 390.)  He continued to have shortness of

15  breath with two blocks of walking, but he stated it was much better than it was six months prior to

16  the examination when he could not walk even 10 feet before becoming short of breath.  (AR 389.)

17  Plaintiff also reported mild to moderate orthopnea and occasional paroxysmal nocturnal dyspnea,

18  but he had no lower extremity edema.  (AR 389.)  Dr. Ericson concluded that because of

19  improvement in Plaintiff's EF, he was not a candidate for defibrillator placement, and he increased

20  Plaintiff's prescription for Diovan.  (AR 390.)

21    On July 8, 2011, Dr. Ericson completed a questionnaire regarding Plaintiff's functional

22  abilities.  (AR 366-68.)  Dr. Ericson diagnosed Plaintiff with heart failure, based on mild-to-

23  moderate left ventricular dysfunction.  (AR 366.)  Dr. Ericson opined Plaintiff's chest pain

24

25  [7] The New York Heart Association Functional Classification characterizes patients' heart failure according to the severity of their symptoms.  Class I patients have no limitation of physical activity.  Ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea.  Class II patients have slight limitations of physical activity.  They

26  are comfortable at rest, but ordinary physical activity results in fatigue, palpitation, and dyspnea.  Class III patients have marked limitation of physical activity.  They are comfortable at rest, but less than ordinary activity causes

27  fatigue, palpitation, or dyspnea.  Class IV patients are unable to carry on any physical activity without discomfort. They experience symptoms of heart failure at rest, and any physical activity undertaken causes their discomfort to

28  increase.   *See   http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp* (last visited September 3, 2015).

occurred throughout the day, but was "most likely non[-]cardiac chest pain." (AR 366.) It caused Plaintiff shortness of breath that would affect his ability to exert himself. (AR 366-67.) His ability to stand and walk would be limited to approximately 6 hours, but his ability to sit was unlimited. (AR 367-68.) Dr. Ericson opined Plaintiff should avoid cold and hot temperature extremes, as well as exposure to fumes, odors, dusts, gases, and poor ventilation. (AR 367.) Dr. Ericson explained that extremes in temperatures were likely to worsen his heart failure symptoms, and exposure to fumes may worsen his breathing. (AR 368.) Dr. Ericson also opined these symptoms would result in Plaintiff being gone from work about twice per month. (AR 368.)

On September 6, 2011, state agency physician L. Guyer, M.D., reviewed the record and affirmed Dr. Nasrabadi's opinion. (AR 375.) Dr. Guyer determined Plaintiff was gradually improving in his underlying condition "with better cardiac performance parameters." (AR 375.) As a result, he concluded Plaintiff was able to perform sedentary-level work. (AR 375.)

On October 25, 2011, Dr. Ericson again examined Plaintiff. (AR 383-85.) Since his last visit, Plaintiff reported he had been put in jail for 17 days, but was released. (AR 383.) He continued to experience dyspnea on exertion after approximately 1 block of walking, and he continued to experience orthopnea with intermittent episodes of paroxysmal nocturnal dyspnea. (AR 383.) Dr. Ericson classified Plaintiff's heart failure symptoms as New York Heart Association class III, but noted he was unsure why Plaintiff had such severe symptoms of heart failure with such improvement to his EF percentage. (AR 384.) Dr. Ericson indicated he would order a MUGA scan[8] to evaluate Plaintiff's systolic function given his severe continued symptoms. (AR 384.)

Also on October 25, 2011, Dr. Ericson completed another questionnaire regarding Plaintiff's functional limitations. (AR 458-61.) He diagnosed Plaintiff with nonischemic cardiomyopathy with New York Heart Association class III symptoms. (AR 458.) Plaintiff's symptoms included fatigue and shortness of breath. (AR 458.) He noted Plaintiff had marked

---

[8] A multigated acquisition scan ("MUGA") creates video images of the ventricles to check whether they are pumping blood properly.

limitation in physical activity, he would experience cardiac symptoms often, and Plaintiff's prognosis was "fair."  (AR 459.)

In December 2011, Plaintiff underwent a MUGA scan which confirmed that his EF was at 39%.  (AR 418-19.)  On January 9, 2012, Plaintiff saw Dr. Ericson for a follow-up.  He reported dyspnea on exertion with fairly minimal activity, and orthopnea even using three pillows to sleep more upright.  (AR 415.)  On examination, his heart rate and rhythm were regular with no murmurs, rubs, or gallops. (AR 416.)  Plaintiff's lungs, however, demonstrated bilateral expiratory wheezes throughout the lung fields. (AR 416.)  Dr. Ericson characterized Plaintiff's heart failure as New York Heart Association class IV, and noted that if he continued to have marked symptoms, other causes for his shortness of breath would have to be evaluated.  (AR 417.)  Dr. Ericson noted Plaintiff was wheezing, which could be related to his heart failure, but Dr. Ericson ordered a pulmonary function test for further evaluation.  (AR 417.)  On January 18, 2012, Plaintiff underwent pulmonary function testing which showed severe obstructive ventilatory dysfunction.  (AR 422.)

On February 14, 2012, Plaintiff followed-up with Dr. Ericson who noted Plaintiff's EF level had improved since he was treated in Utah.  (AR 412.)   He indicated Plaintiff's cardiomyopathy was likely secondary to his cocaine use and heavy alcohol use.  (AR 412.)  Dr. Ericson listed hypertension, hyperlipidemia, and COPD (chronic obstructive pulmonary disease) as Plaintiff's cardiac problems.  (AR 412.)  Dr. Ericson noted Plaintiff continued to be markedly short of breath, unable to walk long distances, and only able to walk a couple of blocks before he experienced dyspnea.  Since his last visit with Dr. Ericson, he noted Plaintiff had undergone pulmonary function testing ("PFTs").  (AR 412.)  Dr. Ericson's recommendations were as follows in relevant part:

> 1. Dyspnea. I suspect his dyspnea is multifactorial.  At this time I do not believe his heart failure is the prominent issue.  I suspect that pulmonary is a bigger problem.  I discussed the findings of the pulmonary function tests with Mr. Neal.  I will start him on Combivent 4 times daily . . . I discussed with Mr. Neal that it is certainly possible that he will have heart failure symptoms again in the future and that any exacerbation of his dyspnea will be somewhat difficult for us to diagnose as we have to distinguish between the COPD and the heart failure . . .

1  (AR 413.)

2        On March 15, 2012, Dr. Ericson completed a third questionnaire regarding Plaintiff's

3  functionality.  (AR 401-04.)  He opined Plaintiff suffered from COPD, and that his heart failure

4  symptoms were class II instead of class III.  Dr. Ericson noted Plaintiff's test results included PFT

5  results showing severe obstructive ventilator defect as well as a left ventricular EF of 39 percent.

6  (AR 401.)  He opined Plaintiff's cardiac symptoms would only seldom interfere with his ability to

7  maintain concentration and attention, and his prognosis was good from a cardiac standpoint, but

8  severely limited from a pulmonary standpoint.  (AR 402.)  As to functional limitation, Dr. Ericson

9  opined Plaintiff could stand and walk less than 2 hours and could sit at least 6 hours.  He also

10  opined Plaintiff would need to take 1-2 unscheduled breaks during an eight-hour workday for

11  approximately 5 to 10 minutes each.  Plaintiff was never to lift more than 50 pounds, could

12  occasionally lift 20 pounds, and could frequently lift 10 pounds or less.  (AR 403.)  He opined

13  Plaintiff should avoid concentrated exposure to extreme cold, heat or humidity, and should avoid

14  even moderate exposure to fumes, odors, dusts, gases, and hazards such as machinery and heights.

15  (AR 404.)

16        On April 6, 2012, Plaintiff was again seen by Dr. Ericson.  (AR 406-08.)  Dr. Ericson

17  noted that at Plaintiff's last visit, he complained of shortness of breath, and his pulmonary function

18  tests showed that he "had a severe obstructive defect consistent with COPD."  (AR 406.)  After his

19  last visit Plaintiff was sent back to Dr. English, his primary care physician, who started him on

20  inhalers, which improved his symptoms somewhat, but he remained markedly fatigued.  (AR 406.)

21  On examination, Plaintiff's heart rate and rhythm were regular with no murmurs, rubs, or gallops,

22  and his lungs were clear to auscultation bilaterally without wheezes, rales, or rhonchi.  (AR 407.)

23  Dr. Ericson indicated Plaintiff's fatigue appeared to be more problematic than his shortness of

24  breath, although he continued to have dyspnea.  (AR 408.)  Dr. Ericson indicated that given

25  Plaintiff's EF of 39%, it was "unlikely that his severe fatigue is due to his cardiomyopathy," but

26  noted that his treatment for COPD had improved his symptoms.  (AR 408.)  Dr. Ericson indicated

27  Plaintiff would continue the treatment as prescribed by his primary care provider for COPD, and

28  would continue treating with Dr. Ericson for his heart failure.  (AR 408.)  He noted Plaintiff had

1  stage C dilated nonischemic cardiomyopathy with New York Heart Association class I symptoms.

2  Dr. Ericson did "not believe his symptoms [were] due to his cardiomyopathy."  (AR 408.)  He

3  noted there was a need for Plaintiff to undergo a sleep study due to suspected sleep apnea.

4  (AR 408.)

5  **B.      Administrative Proceedings**

6      The Commissioner denied Plaintiff's application initially and again on reconsideration;

7  consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 52-

8  56, 58-63.)  On May 23, 2012, the ALJ held a hearing.  (AR 35-49.)  Plaintiff testified, through the

9  assistance of counsel, and a vocational expert also gave testimony.  (AR 35-49.)  Plaintiff's

10  counsel requested that the ALJ amend Plaintiff's alleged onset date to October 25, 2011, which the

11  ALJ agreed to do.  (AR 38-40.)

12          **1.      Plaintiff's Hearing Testimony**

13      Plaintiff testified he was born on September 13, 1966, he completed the 11th grade, but he

14  has not completed a GED.  (AR 40.)  He last worked in 2004 or 2005, but he has tried to work

15  since then in general labor.  His last full-time position was as a bricklayer, which he did for

16  approximately a year.  (AR 42.)  He stopped work due to a 40-day incarceration, but he was let out

17  before the sentence expired because of his health.  (AR 43.)  He is currently unable to work

18  because he cannot breathe, he does not have any strength, and he tires easily.  (AR 43.)  His heart

19  trouble started in 2009, and he is currently being treated by Dr. Ericson.  (AR 43-44.)  Dr. Ericson

20  has prescribed medication, performed another test, and determined that he has COPD.  (AR 44.)

21  He experiences shortness of breath and fatigue; he becomes short of breath performing activities

22  like making his bed, taking a shower, or walking too much.  (AR 45.)

23  //

24  //

25  //

26  //

27  //

28  //

### 2.    The ALJ's Decision

On August 28, 2012, the ALJ issued a decision finding Plaintiff not disabled.  (AR 19-29.) The ALJ determined Plaintiff has the Residual Functional Capacity ("RFC")[9] to lift and carry 20 pounds occasionally, and 10 pounds frequently; sit for six hours in an eight-hour day; walk or stand for two hours in an eight-hour day; and he cannot climb ladders, ropes, or scaffold, and must avoid exposure to work around heights or hazardous machinery.  (AR 23.)

The ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since October 14, 2010, the date of his application; (2) has the following severe impairment or combination of impairment: cardiomyopathy; (3) does not have an impairment or combination of impairments that meets or medically equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) cannot perform his past relevant work; but (5) he is able to perform alternative work that exists in significant numbers in the national economy.  (AR 19-29.)

Plaintiff sought review of the ALJ's decision before the Appeals Council.  (AR 11-15.)  On May 7, 2014, the Appeals Council denied review.  (AR 1-6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

## C.    Plaintiff's Contention on Appeal

Plaintiff contends the ALJ erred in considering Dr. Ericson's opinions in several ways. First, the ALJ erred by failing to consider Plaintiff's COPD diagnosis or discuss the limitations caused by this impairment in formulating the RFC.  Moreover, the ALJ failed to give legally sufficient reasons for refusing to give controlling weight to Dr. Ericson's opinions.  Finally, Plaintiff asserts the ALJ erred in assessing Plaintiff's credibility.

## III.    SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

---

[9] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the

1    claimant has a severe impairment or a combination of impairments significantly limiting her from

2    performing basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step,

3    the ALJ must determine whether the claimant has a severe impairment or combination of

4    impairments that meets or equals the requirements of the Listing of Impairments ("Listing"),

5    20 C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth

6    Step, the ALJ must determine whether the claimant has sufficient residual functional capacity

7    despite the impairment or various limitations to perform her past work.  20 C.F.R. §§ 404.1520(f),

8    416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant

9    can perform other work that exists in significant numbers in the national economy.  20 C.F.R.

10   §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the

11   sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99

12   (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

13                               **V.    DISCUSSION**

14   **A.       The ALJ's Consideration of Dr. Ericson's Opinions**

15             **1.       Whether COPD Diagnosis Was Properly Considered**

16            Plaintiff notes the ALJ found Plaintiff had only one severe impairment – cardiomyopathy.

17   The ALJ only mentioned Plaintiff's COPD once by indicating a diagnostic study revealed

18   significant cardiomyopathy and findings consistent with COPD.  Plaintiff contends this was error

19   because Dr. Ericson ultimately concluded Plaintiff's COPD was the predominant cause of his

20   shortness of breath and related symptoms.  This led Dr. Ericson to determine COPD was the main

21   cause of Plaintiff's ongoing shortness of breath.  Plaintiff contends the ALJ improperly failed to

22   consider Dr. Ericson's diagnosis of Plaintiff's COPD.

23            The Commissioner argues the ALJ's Step-Two analysis referenced findings consistent with

24   COPD and noted severe "impairments" in making the Step Two finding, giving rise to an

25   inference that the ALJ actually did find Plaintiff's COPD to be a severe condition.  Nonetheless,

26   even if the ALJ did not actually consider Plaintiff's COPD to be severe in Step Two, the ALJ

27   "specifically and repeatedly discussed COPD along with other heart-related evidence" in the

28   remainder of the sequential analysis.  The ALJ discussed the normal examination findings made

1   by Dr. Wagner, and noted Plaintiff had a physically active lifestyle.  Dr. Ericson's examination

2   notes also reveal many normal findings.  The Commissioner characterizes Plaintiff's argument as

3   an invitation to reweigh the evidence through citation to excerpts from the record that Plaintiff

4   claims dictate a different result.

5           At the Second Step of the sequential evaluation process, an ALJ must determine whether a

6   claimant suffers from a "severe" impairment.  The regulations define a non-severe impairment as

7   one that does not significantly limit the claimant's ability to do basic work activities.   An

8   impairment is not severe "if the evidence establishes a slight abnormality that has 'no more than a

9   minimal effect on an individual's ability to work.'"  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th

10  Cir. 1996).  To establish that an impairment is severe, a claimant must prove the existence of a

11  physical or mental impairment by providing medical evidence consisting of signs, symptoms, and

12  laboratory findings; the claimant's own statements of symptoms will not suffice.  20 C.F.R.

13  § 416.929.   The effects of all symptoms must be evaluated on the basis of a medically

14  determinable impairment which can be shown to be the cause of the symptoms.  20 C.F.R.

15  § 416.929.

16          The ALJ did not recognize Plaintiff's COPD as a severe impairment at Step Two.  (*See*

17  AR 21.)  Nevertheless, the ALJ found Plaintiff's cardiomyopathy was a severe condition, resolved

18  Step Two in Plaintiff's favor, and continued through the sequential analysis.   To the extent

19  Plaintiff is asserting the ALJ erred by failing to find that his COPD severe at Step Two, such an

20  error is only prejudicial if the ALJ failed to consider Plaintiff's limitations arising out of his COPD

21  at the remaining steps.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); Social Security Ruling

22  ("SSR") 96-8p, 1996 WL 362207, at *34477 (July 2, 1996) (requiring ALJ's RFC assessment to

23  "consider limitations and restrictions imposed by all of an individual's impairments, even those

24  that are not 'severe'").

25          Based on Dr. Ericson's records, Plaintiff's symptoms of dyspnea, orthopnea, paroxysmal

26  nocturnal dyspnea, and fatigue were initially attributed to his cardiomyopathy (*see* AR 395), but

27  after medication treatment and improved EF percentages showing better left ventricular function,

28  these symptoms persisted.   Dr. Ericson ordered pulmonary function testing which indicated

COPD, and Dr. Ericson suspected this was probably a larger contributor to the symptoms Plaintiff experienced than his heart condition.  (*See* AR 410 (Dr. Ericson's notation that he suspected Plaintiff's "symptoms are mostly due to COPD and not heart failure.  His symptoms have not been affected by heart failure treatment, and he initially improved and then worsened again.").)  Even assuming Plaintiff's symptoms of shortness of breath and fatigue are attributable to his COPD rather than cardiomyopathy as Dr. Ericson opined, the ALJ nonetheless considered these symptoms in assessing Plaintiff's functional limitations.  The ALJ noted Plaintiff testified at the hearing he could not work because he does not have the strength and when he attempts to do things, he cannot breathe and quickly grows tired.  (AR 23.)  The ALJ noted Plaintiff was being treated for COPD and that he claimed his symptoms of shortness of breath and fatigue had not subsided.  (AR 24.)  The ALJ reviewed the objective medical findings and noted the physical findings were "unremarkable" and not particularly significant.   In Plaintiff's most recent examinations between October 2011 and April 2012, findings showed Plaintiff was alert, in no acute distress, oriented to time, place, and person and he had regular heart rate and rhythm with no murmurs, rubs, or gallops, and his lungs were clear to auscultation bilaterally without wheezes, rales, or rhonchi.  (AR 25.)  Other than failing to expressly attribute Plaintiff's shortness of breath and fatigue to COPD rather than cardiomyopathy, the ALJ nonetheless considered all the symptoms Plaintiff reported to his physicians and those he articulated at the hearing before the ALJ.  Any error to find Plaintiff's COPD a severe condition at Step Two was harmless in that the ALJ considered Plaintiff's limitations arising from his COPD at the later stages of the sequential evaluation.

### 2.      Whether the ALJ Properly Assessed Dr. Ericson's Opinions

Plaintiff contends the ALJ erred in relying on outdated state agency reviewing physicians' opinions over the more recent and detailed opinions by treating specialist, Dr. Ericson, in formulating Plaintiff's RFC.  The ALJ first rejected Dr. Ericson's opinion regarding Plaintiff's limitation for attending work regularly stating that Dr. Ericson's findings showed significant improvement in Plaintiff's cardiac condition.  Plaintiff argues that in making this finding, the ALJ failed to consider that Plaintiff's symptoms still included fatigue and shortness of breath, which

1   Dr. Ericson attributed to his COPD.  Thus, while Plaintiff's cardiac condition improved, his

2   functional capacity was unchanged because COPD was the predominant cause of his symptoms.

3        Dr. Ericson's treatment records reflect he was searching for the cause of Plaintiff's

4   shortness of breath, dyspnea, and orthopnea because although Plaintiff's heart functioning was

5   improving, these symptoms had not abated.  After the PFTs showing COPD, Plaintiff was treated

6   with inhalers by his primary physician, and these improved his condition further but had not yet

7   eliminated his fatigue.  As a result, Dr. Ericson suspected Plaintiff suffered from sleep apnea for

8   which he recommended further treatment.  Although Plaintiff argues his functional capacity

9   remained "largely the same" despite his treatment for heart failure, this assertion is not supported

10  by the record.  In April 2012, Plaintiff's heart failure was showing improvement on EF testing, his

11  COPD symptoms were somewhat improving on inhalers, although he remained fatigued.

12  (AR 406.)  Plaintiff's symptoms were downgraded by Dr. Ericson to class I, and Dr. Ericson noted

13  Plaintiff's fatigue was essentially the only concerning symptom Plaintiff was experiencing.

14  (AR 407.)  Although Plaintiff still had some shortness of breath issues, he no longer experienced

15  orthopnea or paroxysmal nocturnal dyspnea.   (AR 406.)   Plaintiff's condition had shown

16  improvement over the course of treatment and was it not "largely the same" as it had been in May

17  2010 when he was first treated for heart failure.  The ALJ was entitled to consider the

18  improvement in Plaintiff's symptoms as a basis for rejecting Dr. Ericson's noted limitation that

19  Plaintiff would miss work several days per month due to his condition.

20       The ALJ also considered there that were very few laboratory or clinical findings to support

21  Dr. Ericson's functional capacity opinions, particularly as they related to his opinion that Plaintiff

22  would miss at least 3 days of work per month due to his conditions.  An opinion that is conclusory

23  or inadequately supported by clinical findings may be rejected by an ALJ.  *See Thomas v.*

24  *Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.2 (9th

25  Cir. 2001) (medical opinion is "entitled to little if any weight" where the physician "presents no

26  support for her or his opinion").

27       Plaintiff argues Dr. Ericson's functional capacity opinions were well supported.

28  Specifically, Dr. Ericson consistently listed Plaintiff's heart failure as class II and III, which

represents the class of patients who will experience fatigue, palpitation, dyspnea, or angina pain with even less than ordinary activity.  Plaintiff contends these symptoms provided a reasonable basis for Dr. Ericson's opinion that Plaintiff would miss work during the month.  Dr. Ericson's last functional capacity report, however, was signed on March 15, 2012, and is not well-supported in light of his subsequent findings on examination in April 2012.  Plaintiff reported that his symptoms had improved with an inhaler for his COPD, and his symptoms were only characterized as class I on the New York Heart Association rating scale.   In April 2012, Plaintiff's cardiovascular and pulmonary examination findings were normal with a regular rhythm and heart rate and no wheezing, rales or rhonchi.  (AR 407.)  Dr. Ericson noted Plaintiff experienced some improvement with inhaler treatment, and although Plaintiff was still experiencing some shortness of breath, the only symptom that appeared to be of issue was Plaintiff's fatigue, which Dr. Ericson suspected was related to sleep apnea.  These improvements do not appear to be accounted for in Dr. Ericson's March function report.  Moreover, the clinical basis for Dr. Ericson's opinion that Plaintiff would miss at least 3 days of work each month and would be forced to take unscheduled breaks was not stated and there were no clinical findings discussed or listed to substantiate the limitation.  The ALJ did not improperly reject this opinion due to a lack of clinical findings or because of improvements in Plaintiff's condition.

Plaintiff also argues that his symptoms were consistently noted to be class II or III, which denotes difficulty with fatigue, palpitation, dyspnea, or angina pain with even less than ordinary activity.  However, at his examination in April 2012, Plaintiff's symptoms were only characterized as class I.  There is substantial evidence to support the ALJ's findings of improvement in Plaintiff's symptoms entitling Dr. Ericson's earlier functional capacity opinions to less weight.

Plaintiff also contends the ALJ gave no reasons to discount Dr. Ericson's assessment of environmental limitations, a requirement for unscheduled breaks, elevation of Plaintiff's legs, or limited bending and twisting.  Plaintiff is correct that the ALJ did not include any environmental limitations in the RFC, which appeared to relate to Plaintiff's heart failure and COPD diagnoses.  However, even assuming these environmental limitations should have been included in the RFC, Plaintiff presents no evidence the jobs the VE described would have exposed Plaintiff to any

environmental hazards.  As to the unscheduled breaks, as discussed above, there were no clinical findings noted to support breaks or any discussion why unscheduled breaks would be necessary given the improvement in both Plaintiff's COPD symptoms and his cardiac symptoms noted in April 2012.  (*See* AR 408 ("Treatment for cardiac disease has improved his left ventricular systolic function as well as his symptoms.  Treatment of COPD then improved his symptoms further.").  Dr. Ericson's most recent March 2012 functional capacity opinion did not indicate Plaintiff was required to elevate his legs, but instead specifically stated that Plaintiff had no need to elevate his legs with prolonged sitting.  (AR 403.)  There were no clinical findings showing how Plaintiff was specifically limited from bending or twisting, but Plaintiff has not established that, even if these limitation should have been included in the RFC, these limitations would have precluded the work the VE testified Plaintiff could perform.

Finally, Plaintiff argues the ALJ credited the opinions of Dr. Wagner, Dr. Nasrabadi, and Dr. Guyer, none of whom had access to Plaintiff's pulmonary function tests or Dr. Ericson's diagnosis for COPD.  The opinions therefore were stale and should not have been credited. However, because Plaintiff experienced improvement upon treatment for both his cardiac and COPD conditions, Plaintiff points to no particular findings that may have changed the state agency physicians' opinions.  Moreover, the symptoms Plaintiff complained of were largely the same from the time of the state agency reviewing physician's opinions and Plaintiff's treatment with Dr. Ericson – thus, the state agency physicians had opportunity to consider Plaintiff's fatigue and shortness of breath in evaluating his functional capacity.  It is not clear how the PFT results and Plaintiff's subsequent improvement with inhalers would have altered those physicians' opinions about Plaintiff's functionality.  The ALJ was entitled to rely on these opinions in assessing Plaintiff's RFC.

In sum, the ALJ properly rejected Dr. Ericson's functional capacity assessments as unsupported by clinical findings and because the assessments failed to account for Plaintiff's

17

symptom improvement, particularly the improvement indicated in his April 2012 examination notes.[10]

**B.      Plaintiff's Credibility**

Plaintiff contends the ALJ improperly rejected his symptom testimony based on a lack of objective evidence and a description of his daily activities.  The Commissioner responds the ALJ set forth valid and specific reasons for finding Plaintiff's symptom testimony not credible.  Specifically, the ALJ discounted Plaintiff's credibility because he stopped working due to incarceration rather than a medical impairment, the medical evidence established Plaintiff was functionally able to work, Plaintiff improved with treatment, Plaintiff underwent only conservative treatment of medication management, and Plaintiff's daily activities contradicted his claims of extreme limitations.  According to the Commissioner, these reasons constitute a sufficiently clear and convincing basis to discount Plaintiff's symptom testimony.

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of

---

[10] The Commissioner asserts the ALJ also rejected Dr. Ericson's opinion because it was predicated on Plaintiff's subjective complaints, and Plaintiff's symptom testimony was properly rejected by the ALJ.  Even assuming this reasoning was sufficiently articulated by the ALJ, Dr. Ericson did not give any indication he doubted Plaintiff's symptom testimony such that the ALJ was entitled to discount Dr. Ericson's opinion for this reason.  *Ryan v. Cmm'r Soc. Sec. Admin.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008).

1    treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported
     by substantial evidence, the court may not engage in second-guessing.

2    *Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray*,

3    554 F.3d at 1226-27; 20 C.F.R. §§ 404.1529, 416.929.  "A finding that a claimant's testimony is

4    not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator

5    rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a

6    claimant's testimony regarding pain.'"  *Brown-Hunter v. Colvin*, __ F.3d __, 2015 WL 4620123, *

7    5 (9th Cir. Aug. 4, 2015) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (2015)).

8         Here, the ALJ found Plaintiff's underlying physical impairment could reasonably be

9    expected to produce his pain or other symptoms and there was no evidence of malingering, thus

10   the ALJ was required to give clear and convincing reasons for rejecting Plaintiff's symptom

11   testimony.  *Id.*

12        **1.    Plaintiff's Incarceration**

13        In considering Plaintiff's credibility, the ALJ noted Plaintiff testified that he stopped

14   working because he was incarcerated for riding in a stolen car.  (AR 26.)  The ALJ stated this

15   "raises a question as to whether the claimant's continuing unemployment is actually due to medical

16   impairments."  (AR 26.)

17        An ALJ may consider the fact that a claimant stopped working for reasons other than

18   disability in assessing credibility.  *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001).  It is

19   not entirely clear how Plaintiff's incarceration raises this question, particularly as Plaintiff's heart

20   condition began while he was incarcerated and is the claimed basis for his inability to return to

21   work.  Plaintiff's work history prior to incarceration is limited, however, and the ALJ could have

22   been noting a question as to whether the fact of Plaintiff's incarceration itself is the reason for

23   Plaintiff's continued unemployment, rather than disability.  Although this reason is not by itself

24   clear and convincing, it is evidence the ALJ was entitled to consider along with other clear and

25   convincing reasons, as discussed below.

26        **2.    Conservative and Effective Treatment**

27        Plaintiff contends the ALJ simply cited to selectively normal findings and improvements in

28   finding Plaintiff's treatment was effective, which do not reflect Plaintiff's overall functioning.  For

example, although there were some normal findings in May 2010 noted by the ALJ, at that time Plaintiff was experiencing significant heart failure as evidence by objective testing – i.e., his EF was 10%. The ALJ's citation to certain normal findings ignored the abnormal findings such as nail clubbing, 2+ pitting edema bilaterally to mid tibial level, his lower extremities were cool to the touch, and he had marked jugular venous distention nearly to the angle of the mandible. The ALJ noted improvement in Plaintiff's condition, but incorrectly cited the date of improvement as September 2011. The record reflects, however, the improvement Plaintiff made was in September 2010 and was followed by a worsening of his condition in 2011. The ALJ's citation to an isolated incident of improvement is not an accurate representation of Plaintiff's functioning over time. The ALJ also failed to document Dr. Ericson's objective findings and classification of Plaintiff's symptoms as class II and class III, which indicated shortness of breath with ordinary or less than ordinary activity. Additionally, the classification is not necessarily representative of the degree of symptoms under sedentary testing conditions.

The Commissioner argues that the ALJ's finding of improvement of Plaintiff's symptoms was supported by substantial evidence because Plaintiff's EF percentage had improved significantly from May 2010, and Plaintiff had reported in September 2011 that he was doing well and could walk about a half mile on the track without any problems.

In evaluating Plaintiff's credibility, the ALJ considered that the clinical findings revealed the claimant's treatment was effective in stabilizing and/or improving his physical symptoms. (AR 25.) The ALJ cited a treatment note from September 13, 2010, where Plaintiff reported he was doing very well, and he reported walking roughly one-half mile on a track without problems every other day, but denied orthopnea or any exertional chest pain. The ALJ also cited Dr. Ericson's treatment notes from October 2011 showing Plaintiff's EF had improved from 10% to 40% and 45% in June 2011. In April 2012, Dr. Ericson reported Plaintiff's COPD symptoms were improved, and his EF was at 39%. The ALJ also noted Plaintiff's treatment "has been conservative in nature and not the type one would expect from a disabling condition." The ALJ reasoned the treatment notes were unremarkable and did not support a disabling impairment.

1    The ALJ's finding of improvement is supported by substantial evidence. Plaintiff's

2 cardiomyopathy showed improvement over the course of treatment as evidenced by the increased

3 EF percentages observed between May 2010 and April 2012.  In May 2011, Dr. Ericson noted that

4 despite treatment, Plaintiff continued to have class IV heart failure symptoms (AR 398), including

5 dyspnea on exertion after walking 1/2 block, and nightly paroxysmal nocturnal dyspnea (AR 395).

6 On follow up with Dr. Ericson in July 2011, Plaintiff reported that while he continued to have

7 shortness of breath, it was much better than it was 6 months before.  (AR 389.)  While he had only

8 been able to walk a few feet 6 months previously, he was able to walk approximately two blocks

9 by July 2011.  (AR 389.)  Plaintiff also reported only mild to moderate orthopnea and occasional

10 paroxysmal nocturnal dyspnea at that time.  (AR 389.)  At a January 2012 follow up, Plaintiff was

11 still noted to have class IV symptoms of heart failure, which included shortness of breath, and Dr.

12 Ericson determined pulmonary function tests were necessary to explore other possible causes of

13 Plaintiff's symptoms.  (AR 417.)  On January 18, 2012, Plaintiff underwent a pulmonary function

14 test (AR 420), which revealed severe obstructive defect consistent with COPD.  (AR 413.)  Dr.

15 Ericson noted he had discussed the case with Dr. English, who agreed to follow up with Plaintiff

16 regarding Plaintiff's COPD.  In April 2012, Plaintiff reported he had seen Dr. English and was

17 started on inhalers, which had improved his symptoms somewhat.  Although Plaintiff still reported

18 dyspnea, his fatigue appeared to be "more of a problem" than the shortness of breath.  (AR 406.)

19 Plaintiff was no longer experiencing orthopnea or paroxysmal nocturnal dyspnea.  (AR 406.)

20 Because Plaintiff's EF was improved, his continued fatigue did not appear related to his

21 cardiomyopathy, and Dr. Ericson suspected it was related to sleep apnea because there was a "high

22 prevalence of sleep apnea in the heart failure population."  (AR 408.)  Dr. Ericson concluded that

23 he did not believe Plaintiff's symptoms were related to his cardiomyopathy.  (AR 408.)

24    There is substantial evidence that Plaintiff's symptoms were improving, even those related

25 to his COPD.  Although Plaintiff's reported fatigue remained a problem in April 2012, Dr. Ericson

26 had recommended pursuing a sleep study to determine whether treatment for sleep apnea might

27 alleviate the problem.  Also, Dr. Ericson downgraded Plaintiff's symptoms to class I, whereas they

28 had been characterized as class III and IV earlier.  Because Dr. Ericson's March 2012 functional

1  capacity opinion was given prior to Plaintiff's follow up appointment noting improvement in April

2  2012, it is not clear how the opinion accurately reflected Plaintiff's current condition.  It was not

3  improper for the ALJ to conclude Plaintiff's improvement undercut the extent of Plaintiff's

4  symptom testimony.

5       Additionally, Plaintiff's treatment was generally conservative in nature.  Medication was

6  prescribed for Plaintiff's heart failure, which appeared to be effective in improving Plaintiff's left

7  ventricular function and thus Plaintiff was not a candidate for more invasive treatment including a

8  defibrillator placement.  Plaintiff was prescribed inhalers for his COPD from which he obtained

9  some improvement in his breathlessness as he was no longer reporting any orthopnea or

10 paroxysmal nocturnal dyspnea (AR 406), and a sleep study was recommended to address his

11 remaining symptom of fatigue.  This treatment is relatively conservative, and it appeared to be

12 progressively addressing and improving Plaintiff's symptoms.  *Johnson v. Shalala*, 60 F.3d 1428,

13 1434 (9th Cir. 1995) (conservative treatment can suggest a lower level of both pain and functional

14 limitation, justifying an adverse credibility determination).  The generally conservative treatment

15 of Plaintiff's conditions and the subsequent improvement constituted a legally sufficient basis to

16 reject the extent of Plaintiff's symptom testimony.

17       **3.**     **Daily Activities**

18       The ALJ also rejected Plaintiff's symptom testimony as incredible because Plaintiff

19 "describe[d] an active life that includes an ability to do a few chores around the house, drive

20 occasionally, perform all his own activities of daily living without assistance and without any

21 significant shortness of breath, go shopping, perform light exercise, and do some walking."

22 Plaintiff reported these activities to Dr. Wagner during the consultative examination in March

23 2011.  (AR 340-41.)

24       Plaintiff contends that, although he does perform these activities, he does not drive more

25 than occasionally because he becomes somewhat dizzy, and he lives with his mother and does

26 only a few chores around the house.  Although his exercise includes walking and attempting to lift

27 five-pound weights, he explained that in the several months before the examination, he had only

28 been able to walk one to two blocks and he was having some dyspnea on exertion when climbing

only one flight of stairs.  None of his admitted activities are inconsistent with the symptoms he describes.  Dr. Ericson stated Plaintiff could lift up to 20 pounds despite his cardiomyopathy and COPD, but he would still require unscheduled rest breaks, and would miss work two or more times per month due to his impairment.

Although there is some evidence Plaintiff's daily activities were limited, Plaintiff's daily activities nonetheless contradict his statements about the extent of his limitations.  Plaintiff stated at the hearing he could not breathe, he hurt every day, and if he tried to "do something," he could not breathe.  (AR 43.)  This is contradicted by Plaintiff's admitted daily activities, even in the limited manner Plaintiff claims they were performed.  There is substantial evidence to support the ALJ's finding regarding the extent of Plaintiff's daily activities.

**4.    Conclusion**

The ALJ provided legally sufficient reasons to reject Plaintiff's symptom testimony including that it was not supported by the medical evidence, Plaintiff's daily activities were inconsistent with his symptom testimony, and Plaintiff appeared to have stopped working for reasons unrelated to his claimed disability.

## VI.    CONCLUSION

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **September 7, 2015**                                **/s/ Sheila K. Oberto**
                                                       UNITED STATES MAGISTRATE JUDGE